CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 27 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

|  |  |  |
|---|---|---|
| DEMOND LAWRANCE JONES, | ) | Civil Action No. 7:16-cv-00469 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| TYLER N. BAILEY, et al., | ) | By: Hon. Jackson L. Kiser |
| Defendants. | ) | Senior United States District Judge |

Demond Lawrance Jones, a Virginia inmate proceeding pro se and as a pauper under 28

U.S.C. § 1915, filed an amended verified complaint (ECF No. 37-1) pursuant to 42 U.S.C.

§§ 1983 and 2000cc-1, et seq., and Virginia law. Plaintiff names several administrative and

correctional staff of the Wallens Ridge State Prison ("WRSP") as defendants. Plaintiff alleges

that Defendants are liable for violating the First and Eighth Amendments of the United States

Constitution, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and state

tort law by using excessive force, not allowing him to practice his religion, and retaliating

against him. Defendants filed a motion for summary judgment, and Plaintiff filed a 257 page

response, making this matter ripe for disposition. After reviewing the record, I grant in part and

deny in part Defendants' motion for summary judgment and direct them to file another motion

for summary judgment.

### I.
### A.

Plaintiff states he is a sincere adherent to the religion Nation of Islam ("NOI"). Part of

his religious beliefs include consuming a special diet, wearing a head cover called a Kufi, and

praying five times a day with other NOI adherents.[1] Islamic prayer, called "Salat," requires

Plaintiff to stand, bend, kneel, and be prostrate. Plaintiff complains he is unable to pray inside

---

[1] The five times are just before sunrise, noon, between 15:00 and 16:30, sunset, and at bed time.

his cell due "to the restrictive cell size," "nearby depiction of images in the form of family pictures, calendars, television programs," and "disrespectful non-religious cell mates who[] interfere with such prayer spitefully and apathetically." Plaintiff also complains that during in-pod recreation time, he is forced to choose between praying and "recreation programs and privileges as phone calls, showers, schooling, [or] work assignments. . . ."

Plaintiff complains that he is not permitted to wear a Kufi in the pod.[2] Plaintiff also complains that he is not allowed to congregate with other Muslims in his pod to pray five times a day or for "Taleem" to learn their religion. Instead, Plaintiff is allowed to congregate to pray with other NOI adherents once a week for "Jummah" prayer in the gym. Nevertheless, Plaintiff complains that Sgt. Smith prohibited Plaintiff from attending the Jummah service on September 26, 2014, and the "Savior's Day" service on February 26, 2016.

Plaintiff complains that WRSP Food Service staff modified the Common Fare Diet ("Common Fare"). Common Fare had served Kosher and Halal foods that conformed to Plaintiff's religious dietary requirements. However, Plaintiff asserts that WRSP staff no longer serves foods on Common Fare that comport with his religious beliefs. For example, Plaintiff complains that, despite his religious objections, staff serves him pork-tainted peanut butter, tuna cake, and soy patties in barbeque sauce. Plaintiff specifically identifies seven "burdens" imposed by Common Fare: "pork byproducts"; "filler in fish (not Kosher)"; no whole fruits; "[e]xcessive eggs or (boiled eggs)"; "storing Common Fare foods with unkosher foods"; "[h]ard, uncooked beans (navy bean)"; and "unreal meats (genetically modified organism)."

---

[2] Plaintiff acknowledges he may wear the Kufi during congregational prayer and while either inside his cell or outside during recreation.

Plaintiff also complains that he was "forced" during Ramadan in 2016 to eat Common Fare trays specifically designed for NOI inmates instead of generic Common Fare trays. Plaintiff clarifies that his:

> [R]eason for requesting Common Fare Diet on my contract during the month of Ramadan is to avoid hardship. Also, such meals are fixed and consistent as it is standard Kosher. On the made up NOI Common Fare, kitchen staff ha[s] exercised hate. Rice and beans are not properly cooked. Alteration to meals, excessive boiled eggs, missing items or portions of food, like bag third meal. Plaintiff was subjected to this for and during the 2016 [thirty] day month of Ramadan.

Plaintiff concludes that that "kitchen staff . . . modif[ied] our food almost on a daily basis, adding to it, taken away from it. This put a substantial burden on Plaintiff's sincere ability to fast and complete a [thirty] day religious obligation. Constant alteration of meals and denial of requested meal raises a legitimate issue of deprivation." Consequently, "Plaintiff could not fast on a number of days d[ue] to his inability." Plaintiff argues that WRSP "benefitted greatly" by receiving federal funds to provide Common Fare and charging him approximately $2.70 as an unpaid loan against his inmate trust account for the costs of two meals.

In support of his retaliation claims against defendants Smith and Combs, Plaintiff describes his dissatisfaction with prison life, starting in 2010. Around "2010-2012," a correctional officer ("C/O") and defendant Combs, who was then a Major but is now the Assistant Warden, acted "overly aggressive for no reason" toward Plaintiff and his cellmate during a routine institutional shakedown. Combs told the correctional officer to "get rid of all (Islamic material) stuff." When Plaintiff objected to the officers discarding his religious newspapers, Combs loudly said, "[I]f Plaintiff Jones attempts to teach Islam, he would bury Plaintiff Jones in segregation," and the correctional officer said "he'll bust Plaintiff['s] face."

Consequently, Plaintiff decided not to attend NOI services between 2010 and 2013. Plaintiff believes that decision is why he did not receive institutional charges between 2010 and 2013.

In mid-2013, Plaintiff became the NOI program coordinator and minister, and Combs began "tactful schemes" to discontinue the NOI service. For example, on January 3, 2014, Plaintiff was segregated for an institutional charge and Combs had Plaintiff released into a "well known violent gang pod." Plaintiff was allegedly targeted for an attack by several gang members on orders from a sergeant, but other members of the gang informed Plaintiff. Undeterred, the sergeant, purportedly on Combs' orders, filed a "false" disciplinary charge and had Plaintiff moved into segregation.

Sometime around March 2014, Combs asked Plaintiff, "How did you like C-building?" which made "Plaintiff realize[] his life was in danger." Plaintiff wrote a letter to the then-warden of WRSP and the chief of the VDOC's Special Investigation Unit to inform them of his fear. Around that same time, Combs, then the Assistant Warden, purportedly used rival gang members to disrupt the NOI service. Although usually separated, these competing gang members would fight when allowed to congregate during the NOI service. Plaintiff believes Combs orchestrated the fights as a pretext to suspend NOI services for six months.

In September 2014, Plaintiff told a lieutenant that Sgt. Smith was repeatedly planting contraband in inmates' cells and then charging them for possessing contraband. As a result of Plaintiff's tip, Sgt. Smith was reassigned from C-building to D-building.

Later in September 2014, Sgt. Smith plotted a "verbal assault" and prevented Plaintiff from attending Jummah service. Sgt. Smith "trash[ed] and confiscate[ed] religious material, Final Call newspapers, and one book[,] Message to the Black Man." Sgt. Smith told Plaintiff it "won't be long before Plaintiff would be paid back for what he did." Plaintiff tried to pursue

4

administrative remedies about these issues, but the grievance was "high jack[ed] . . .[,] which hindered Plaintiff from litigating," all allegedly on Combs' orders.

On October 8, 2015, defendants Sgt. Ferguson[3] and C/O Bailey chose to search Plaintiff's cell. During the search, C/O Bailey tossed a prayer rug and Holy Quran on the cell floor and seized rechargeable batteries and a Kufi. Plaintiff objected, accusing Combs of ordering the search because of Plaintiff's religious beliefs and to "fabricate a situation." C/O Bailey allegedly shouted, "Fuck Islam." Plaintiff's Kufi was confiscated as contraband.

Next, Sgt. Ferguson and C/O Bailey escorted Plaintiff, who was handcuffed behind his back, "forcefully" toward the staircase while Sgt. Ferguson ordered C/O Bailey to falsely charge Plaintiff with "threatening." Once they reached the breezeway, the officers pushed Plaintiff's head against the wall and pummeled him, including hits to his lower back. Even after he lost consciousness and fell to his knees, the officers continued to "knock Plaintiff around." At some point, these officers resumed the escort and Plaintiff resumed consciousness, at which point he requested medical treatment for his "injury[,] pain[,] and suffering."[4] Plaintiff alleges generally that "medical attention was denied." Plaintiff denies ever posing a threat to either officer or breaking any institutional rule. Plaintiff wants Combs found liable as a "bystander" for ordering the alleged attack.

Plaintiff was ultimately taken to the D-building segregation unit. C/O Bailey explained to defendant Sgt. Smith that Plaintiff was there for "running his mouth." Sgt. Smith replied, "I was going to get him," and repeatedly called Plaintiff "a bitch." Plaintiff claims that Sgt.

---

[3] Plaintiff refers to Sgt. Ferguson as Sgt. "Furguson."

[4] A month later in November 2015, Plaintiff sought medical attention for lower back pain and because blood appeared when he passed gas. In a regular grievance dated December 14, 2015, Plaintiff alleged he sustained an injury on October 8, 2015, and the "pain accrue[d] around the 20th and beyond."

Smith's statements were retaliation because of "past encounters" and on Combs' orders because of Plaintiff's religion.

On October 8, 2015, Officer Smith charged Plaintiff with a false "threatening" charge. Again, Plaintiff believes it was retaliation for the events from September 2014, to keep Plaintiff from acting as a minister for NOI services, and to lengthen Plaintiff's time in segregation.

On February 26, 2016, Sgt. Smith denied Plaintiff entry into the NOI service to celebrate Savior's Day. Sgt. Smith ordered another officer to aim a gun at Plaintiff and yelled at Plaintiff, "Didn't I tell you, you weren't going to program!"

On June 6, 2016, Plaintiff signed a contract to receive Common Fare during the approximately thirty-day long Islamic holiday of Ramadan. However, he was served the NOI Common Fare meals, not the regular Common Fare meals, which allegedly violated Plaintiff's religious rights because it "limited the variety or selections to eat[,] subjecting Plaintiff . . . who w[as] striving to complete such a[n] already strenuous eating habit the privilege to enjoy rights funded by the federal government and by (RLUIPA)." Plaintiff was ultimately charged the costs of the Common Fare meals he ate during Ramadan's fasting hours.

Plaintiff accuses Warden Fleming of having been informed, by both him and the former warden, of Combs' retaliatory "acts of religious deprivation, false institutional cell searches, personal searches, institutional charges, and constan[t] segregation." Plaintiff faults Warden Fleming for not authorizing an investigation as Plaintiff had requested. Plaintiff also faults Warden Fleming for "never correcting staff, never disciplining staff, never investigating inmate complaints on staff," thereby "creat[ing] the custom of action by WRSP employees."

## B.

The VDOC created Common Fare to satisfy inmates' various religious dietary needs and restrictions, and thus, no pork products are to be used. In accordance with the VDOC Food Service Manual, WRSP offers Common Fare to inmates whose religious dietary needs cannot be met by the regular menu. Common Fare meals at WRSP are prepared in an area separate from the regular menu preparation area, with separate utensils, and with designated Common Fare equipment. The hot meals are prepared in designated cooking vessels in a designated area of the kitchen.

On September 29, 2015, WRSP began offering a new CF menu, as directed by the VDOC Food Services Director. The new menu includes hot food items at most meals with only a few cold meals each week. Prior to this change, Common Fare meals were served cold except for three hot meals each month.

Kufis are approved for possession by male inmates and must be worn in the same manner, time, location, and circumstances as non-religious head covers. All head covers are regulated for security reasons. For example, inmates are allowed to wear head covers during outside recreation because they are thoroughly searched before and after outside recreation. However, inmates may not wear head covers during recreation in the pod because there is no pod-wide search required before in-pod recreation, and consequently, weapons, notes, and other contraband could be easily concealed in the pod under head covers.

Also for security reasons, inmates are not allowed to gather in groups, whether for religious or sectarian reasons, in the pod during recreation. Instead, they are provided opportunities to meet for religious services in designated areas under supervision. Warden Fleming explains that policy allows NOI inmates meet once each week and during designated

7

holidays and does not prevent Plaintiff from praying in the pod area independently and in an upright position.

NOI inmates at WRSP are allowed to participate in the NOI Month of Fasting, which is more commonly observed worldwide as Ramadan.[5] The observance requires participants to fast during the day between astronomical twilight and sunset. In order to accommodate this religious practice, meals are provided at additional times.

In advance of the holiday, the VDOC issues a memorandum to inmates, informing them of any sign-up procedures and any deviation from routine facility operations. An inmate who signed up for the Month of Fasting but chose to receive a meal during fasting hours could expect to be charged $1.35 per meal but would not otherwise not penalized for not fasting. Defendants' records indicate that Plaintiff was charged for two meals he received during fasting hours and was not otherwise prevented from participating in Ramadan in 2016. Plaintiff argues that charging Plaintiff for meals is "in itself place hardship on the day to day functioning."

## II.

Plaintiff did not commence this action until October 1, 2016, at the earliest.[6] A plaintiff bringing a civil rights action via § 1983 for events arising in Virginia must do so within two years from the time when his action accrues. See Owens v. Okure, 488 U.S. 235, 239-40 (1989); Va. Code § 8.01-243(a). A plaintiff bringing a claim via RLUIPA must do so within four years from the time when the claim accrues. 28 U.S.C. § 1658; Jones v. R. R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004). A federal cause of action accrues when "the plaintiff has a complete

---

[5] Ramadan is a month of fasting observed by traditional Sunni Muslims, and the NOI Month of Fasting is an equivalent month of fasting for members of the NOI Muslim faith. Plaintiff refers to the holiday as Ramadan, and so I adopt his description.
[6] Plaintiff dated a letter that accompanied the complaint as October 1, 2016.

and present cause of action" or when the plaintiff "can file suit and obtain relief." Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997) (internal quotation marks omitted).

Plaintiff could have pursued claims about the conditions he experienced at WRSP via § 1983 accruing before October 1, 2014, and via RLUIPA accruing before October 1, 2012. Plaintiff is proceeding as a pauper, and this defense is apparent from the amended complaint. See, e.g., Eriline Co. S.A. v. Johnson, 440 F.3d 648, 656 (4th Cir. 2006) (recognizing a court may raise the statute of limitations defense sua sponte for a litigant proceeding under 28 U.S.C. § 1915). Accordingly, the statutes of limitations bar § 1983 claims accruing before October 1, 2014, and RLUIPA claims accruing before October 1, 2012.

### III.

Defendants filed a motion for summary judgment, arguing that they are entitled to qualified immunity. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993).

A party is entitled to summary judgment if the pleadings, the disclosed materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing admissible evidence and all reasonable inferences drawn therefrom in a light

most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A party is entitled to summary judgment if the admissible evidence as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

## IV.

Defendants are entitled to summary judgment as to damages sought for the RLUIPA claims and official capacity claims. RLUIPA does not authorize damages against a public official. See Sossamon v. Texas, 563 U.S. 277, 282 n.1, 293 (2011) (prohibiting damages claims against state officials in their official capacity); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity); see also Washington v. Gonyea, 731 F.3d 143, 146 (2d Cir. 2013) (discussing the construction of RLUIPA). Also, the Commonwealth of Virginia has not waived its sovereign immunity to § 1983 damages actions. See, e.g., Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Accordingly, Defendants' motion for summary judgment is granted as to damages against them in their official capacities or via RLUIPA.

Defendants are entitled to Eleventh Amendment immunity for alleged violations of tort law. A "nonconsenting [s]tate[] may not be sued by private individuals in federal court[,]" unless the sovereign has waived immunity. Bd. of Trustees v. Garrett, 531 U.S. 356, 363 (2001). Although the Commonwealth of Virginia enacted the Virginia Tort Claims Act ("VTCA") and allowed itself to be sued for tort claims filed in state courts, it has not waived its Eleventh Amendment immunity and has not consented to be sued in federal courts. McConnell v. Adams, 829 F.2d 1319, 1329 (4th Cir. 1987); Creed v. Virginia, 596 F. Supp. 2d 930, 938 (E.D. Va. 2009). Furthermore, under the plain language of the VTCA, such claims may only be maintained against the Commonwealth, not against individual state officers like Defendants. Va. Code Ann. § 8.01-195.1. Accordingly, Defendants' motion for summary judgment is granted as to the tort claims.

## V.
### A.

The First Amendment's Free Exercise Clause and RLUIPA serve to protect the exercise of sincerely-held religious beliefs from being substantially burdened. To determine whether a plaintiff establishes a prima facie claim, a court must decide whether a plaintiff sincerely held the avowed belief and whether the belief is, in a plaintiff's own scheme of things, religious. United States v. Seeger, 380 U.S. 163, 185 (1965). Only a personal practice that is both sincerely held and rooted in religious belief is protected. See, e.g., Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005); Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). Distinguishing between religious and secular beliefs, sincere or insincere, is difficult. See, e.g., Frazee v. Illinois Emp't Sec. Dep't., 489 U.S. 829, 833 (1989). Nevertheless, sincerity of belief is the critical, threshold aspect of the

inquiry I must consider: whether plaintiff's asserted religious beliefs are beliefs "sincerely held and . . . in [his] own scheme of things, religious" at that time. Seeger, 380 U.S. at 185.

A "substantial burden" on religious exercise protected by the First Amendment or RLUIPA occurs if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006); see, e.g., Patel v. Bureau of Prisons, 515 F.3d 807, 814 (8th Cir. 2008) ("When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA."). Under either the First Amendment or RLUIPA, the inmate must also demonstrate that the substantial burden was a product of a defendant's conscious or intentional interference with religious rights. Wall v. Wade, 741 F.3d 492, 500 n.11 (4th Cir. 2014). "Allowing negligence suits to proceed under RLUIPA [or the First Amendment] would undermine . . . deference [to the experience and expertise of prison and jail administrators] by exposing prison officials to an unduly high level of judicial scrutiny." Lovelace, 472 F.3d at 194; see Shaheed v. Winston, 885 F. Supp. 861, 868 (E.D. Va. 1995), aff'd, 161 F.3d 3 (4th Cir. 1998). Consequently, less than intentional conduct is not sufficient to meet the fault requirements under RLUIPA or the First Amendment.

Plaintiff establishes sincerely-held religious beliefs and substantial burdens for all but two of his religion claims.[7] Accordingly, Defendants are entitled to qualified immunity and summary judgment for these two religion claims.

---

[7] Plaintiff did not address any substantial burden arising from the search in September 2016 that "trashed" his cell.

Plaintiff fails to establish a sincerely-held religious belief or a substantial burden about being served varied foods on the "NOI Common Fare" trays instead of "Common Fare" trays and about being charged money for two meals during Ramadan. His description of a "substantial burden" for these claims usually just relies on that phrase, which constitutes an insufficient label and conclusion. See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When he does try to describe a substantial burden, it is nonsensical. For example, he argues that serving an NOI Common Fare tray to an NOI adherent is an "exercise of hate" by kitchen staff. Essentially, he complains that being served an NOI Common Fare tray that he did not want caused him to break his fast and consume foods he also did not want during the thirty day fast. Even if he was presented with more varied food items on the NOI Common Fare, variation of NOI acceptable foods does not compel him to eat them. Plaintiff's breaking of his fast, admittedly due to his own "inability," is not a "substantial burden" imposed by the government. More importantly, Plaintiff fails to demonstrate that consuming eggs or "improperly cooked" rice and beans has any impact to his religious faith. Notably, none of this conduct is imputable to any intentional conduct on the part of a named defendant. Furthermore, Plaintiff's frivolous argument that the meal charges for consuming additional meals constitutes a "substantial burden" as a "hardship on . . . day to day functioning" is unpersuasive. Accordingly, Defendants are entitled to qualified immunity and summary judgment as to the claim about being served NOI Common Fare trays during Ramadan in 2016.

Plaintiff also fails to establish a sincerely-held religious belief or a substantial burden about the inability to pray inside his cell due to personal property in the cell, cellmates, or competing recreation options during free time. None of these circumstances is imputable to Defendants' intentional conduct.

13

**B.**

Viewing the inferences in a light most favorable to him, Plaintiff establishes that he is

substantially burdened by several of Defendants' personal acts, omissions, or policies. These

claims are the confiscation of his Kufi; the inability to pray in his cell "due to the restrictive cell

size"; the inability to pray in the pod in groups of two or more; the inability to wear a Kufi in the

pod; the foods served on Common Fare at WRSP generally; being barred from Jummah service

on September 26, 2014,[8] and from Savior's Day service on February 26, 2016; and not being

allowed to congregate weekly for Taleem.

RLUIPA prohibits government officials from imposing a substantial burden on the

religious exercise of an inmate unless the government demonstrates that the burden furthers a

compelling governmental interest and is the least restrictive means of furthering that interest.[9]

42 U.S.C. § 2000cc-1(a). "The least-restrictive-means standard . . . requires the government to

show that it lacks other means of achieving its desired goal without imposing a substantial

burden on the exercise of religion by the objecting party." Jehovah v. Clarke, 798 F.3d 169, 177

(4th Cir. 2015) (quoting Holt v. Hobbs, 135 S. Ct. 853, 864 (2015)).

In contrast, a correctional policy or practice that substantially burdens an inmate's First

Amendment right is valid if it is reasonably related to legitimate penological interests. Lovelace,

472 F.3d at 199. Whether a regulation is reasonably related depends on:

> (1) [W]hether there is a "valid, rational connection" between the prison
> regulation or action and the interest asserted by the government, or whether
> this interest is "so remote as to render the policy arbitrary or irrational"; (2)
> whether "alternative means of exercising the right ... remain open to prison
> inmates," an inquiry that asks broadly whether inmates were deprived of all

---

[8] This religious claim is limited to RLUIPA only as the two-year statute of limitations bars the claim under § 1983.

[9] "Government" includes the defendants, who work for the VDOC. 42 U.S.C. § 2000cc-5(4)(A).

forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

Id. at 200 (citing Turner v. Safley, 482 U.S. 78, 89-92 (1987)); see Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (recognizing the prisoner has the burden to disprove the validity of a prison regulation pursuant to the Turner analysis).

Plaintiff fails to disprove the reasonableness of the prison conditions, regulations, or actions about the inability to wear a Kufi in the pod. While Kufis are approved items, they must be worn in the same manner, time, location, and circumstances as non-religious head coverings. Head covers may be worn during outside recreation because all inmates are searched to ensure the safety of inmates and staff and to maintain security on the yard. However, staff does not spend scarce resources to thoroughly search each inmate before every routine release into the pod. Because no search is required before in-pod recreation, inmates are prohibited from wearing head coverings in the pod to better allow staff to discover contraband, prevent violence, and maintain security. Plaintiff may wear a Kufi at other locations and times and practices other aspects of his faith. Plaintiff's alternatives do not substantially address the intersection of security and efficiency of the prison's operations. Accordingly, Defendants are entitled to qualified immunity and summary judgment about wearing Kufis in the pod.

However, the record needs to be better developed for the First Amendment claims about the confiscation of the Kufi; the inability to pray in the cell and in groups of two or more in the pod; the foods served on Common Fare at WRSP generally; being barred from Savior's Day

service on February 26, 2016; and not being allowed to congregate weekly for Taleem.[10] The record also needs to be better developed for the RLUIPA claims about those same claims plus being barred from Jummah service on September 26, 2014, and allowing Kufis to be worn in the pod. Accordingly, Defendants shall file a motion for summary judgment supported by affidavit(s) addressing these remaining claims.

## VI.

Defendants' motion for summary judgment is granted in part and denied in part as to the claims of excessive force arising from October 8, 2015. The law was clearly established by October 2015 that a correctional officer may not inflict unnecessary and wanton pain and suffering on a prisoner. Whitley v. Albers, 475 U.S. 312, 320 (1986). A prisoner alleging excessive force in violation of the Eighth Amendment must show that a defendant "inflicted unnecessary and wanton pain and suffering." Id. The inquiry is whether the force applied was "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. at 320-21. This question is resolved by considering the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. Id. at 321. The fact an inmate may have escaped serious injury is not fatal to an excessive force claim. See, e.g., Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).

---

[10] For example, Plaintiff proposes that all the Muslim inmates would agree to congregational prayer in the pod two inmates at a time with minimal noise and no crowding or gathering. For example, two squares of a couple of square feet could be marked on the floor as the area where two Muslim inmates could pray at the same time. Plaintiff suggests that the areas could be set far enough apart for crowd control but close enough to constitute congregational prayer. Plaintiff explains that in-pod recreation usually means there are forty-four inmates mingling in a large area designed for eighty-eight inmates. Also, there is some discrepancy whether Plaintiff's Kufi was confiscated because it was homemade or because it merely was not a specific color.

Plaintiff alleges he was peaceable and fully compliant before Sgt. Ferguson and C/O Bailey threw him into a wall and pummeled him, causing pain in his lower back and kidneys. In contrast, Defendants completely deny that they used such force. Accordingly, disputes of material facts preclude summary judgment as to the excessive force claims against Sgt. Ferguson and C/O Bailey. See Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995) (finding summary judgment not proper when resolution of qualified immunity question and claim itself both depend upon determining what happened).

Similarly, disputes of material facts preclude summary judgment as to bystander liability claims against Sgt. Ferguson and C/O Bailey. A correctional officer may be liable on a theory of bystander liability if the officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's Cnty., Md., 302 F.3d 188, 204 (4th Cir. 2002); see Willis v. Oakes, 493 F. Supp.2d 776, 784 (W.D. Va. 2007) (noting a plaintiff must prove a violation of a constitutional right as a prerequisite to establishing bystander liability). I cannot conclusively determine whether Sgt. Ferguson or C/O Bailey knew the other officer was inflicting cruel and unusual punishment.

However, Warden Fleming and Combs are entitled to qualified immunity and summary judgment for the bystander liability claims asserted against them. There is nothing in the record to support an inference that either defendant was contemporaneously aware of the specific alleged use of excessive force on October 8, 2015, or that they had a reasonable opportunity to prevent it.

Accordingly, Defendants' motion for summary judgment is granted in part as to bystander liability for Warden Fleming and Combs, and it is denied in part as to Sgt. Ferguson and C/O Bailey. These remaining claims will be resolved by a jury trial.

## VII.

Plaintiff further faults Sgt. Ferguson and C/O Bailey for not facilitating medical attention after they allegedly beat him on October 8, 2015. Disputes of material facts preclude qualified immunity and summary judgment, and these claims must be resolved by a jury trial.

A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need to state a claim under the Eighth Amendment for the unconstitutional denial of medical assistance. West v. Atkins, 487 U.S. 42, 48 (1988); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Conner v. Donnelly, 42 F.3d 220, 222 (4th Cir. 1994). A serious medical need is a condition that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52.

18

To succeed with an unconstitutional medical treatment claim in this case against Sgt. Ferguson or C/O Bailey, Plaintiff must show that the officer was personally involved with a denial of treatment. Id. at 854. As alleged, these defendants vigorously struck Plaintiff's lower back and kidneys until he lost consciousness. When he regained consciousness, Sgt. Ferguson and C/O Bailey refused Plaintiff's request for medical attention to treat his back and kidney pain, dizziness, and nausea. In contrast, Sgt. Ferguson and C/O Bailey argue that no medical attention was needed because they did not strike Plaintiff. Accordingly, Defendants' motion for summary judgment is denied as to these claims, and they will be resolved by a jury. See, e.g., Buonocore, 65 F.3d at 359.

## VIII.

Plaintiff lists various events that he believes constitutes unlawful retaliation. "To state a First Amendment retaliation claim, a plaintiff must show that (1) his speech was protected, (2) the alleged retaliatory action adversely affected his protected speech, and (3) a causal relationship existed between the protected speech and the retaliation." Hoye v. Gilmore, 691 F. App'x 764, 765 (4th Cir. 2017) (citing Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015)). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks omitted). It was clearly established as of October 2014 that inmates have a constitutional right to be free from retaliation for filing prison grievances and for practicing their religions.[11] See, e.g., Booker

---

[11] By operation of the statute of limitations, Plaintiff actionable claims of retaliation are limited to claims accruing on or after October 1, 2014.

v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017) (discussing retaliation in context of grievances and how to view the "clearly established" prong of qualified immunity).

Plaintiff fails to establish an actionable claim of retaliation as to a search of his cell; tossing a prayer rug or the Holy Quran on the floor; seizing batteries; being transferred to the D-building; being called "a bitch"; receiving NOI Common Fare meals during Ramadan in 2016; and being billed, per policy, approximately $2.70 for Common Fare meals in 2016. Plaintiff fails to establish both how these events adversely affected speech to such an extent to deter a person of ordinary firmness from exercising a right and how a causal relationship existed between any protected speech and the retaliation. Accordingly, Defendants are entitled to qualified immunity and summary judgment for these claims of retaliation.

Viewing the inferences in a light most favorable to him, Plaintiff has stated timely-filed and clearly-establish retaliation claims as to Sgt. Ferguson and C/O Bailey allegedly seizing his Kufi and beating him. Plaintiff also has stated timely-filed and and clearly-establish retaliation claim as to Sgt. Smith allegedly charging him with a false disciplinary violation; not allowing Plaintiff to attend the Savior's Day service on February 26, 2016; and ordering staff to aim a firearm at Plaintiff on February 26, 2016. Accordingly, Defendants' motion for summary judgment is denied in part as to these retaliation claims.

## IX.

Plaintiff argues that Warden Fleming and Combs are responsible for subordinates' conduct. While Plaintiff cannot proceed under the theory of respondeat superior, such claims are possible as to the supervisor's deliberate indifference. See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (discussing the deliberate indifference standard for a supervisor's liability under § 1983). Inasmuch as these defendants have not yet addressed their alleged deliberate

indifference as supervisors, they shall file a motion for summary judgment supported by affidavit(s) for these claims.

**X.**

For the foregoing reasons, I grant in part and deny in part Defendants' motion for summary judgment and direct them to file a motion for summary judgment supported by affidavit(s) pursuant to Standing Order 2013-6.

**ENTER:** This 21st day of March, 2018.

Senior United States District Judge